IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>BRANDEN JAY LOUNSBURY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 3:26-CR-10<br><br>JUDGE JAMES R. KNEPP, II<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

Now comes the United States of America, by its counsel, David M. Toepfer, United States Attorney, and Tracey Ballard Tangeman, Assistant U.S. Attorney, and hereby submits its Sentencing Memorandum in which it seeks application of the +2 Reckless Endangerment Enhancement in § 3C1.2. With the +2 enhancement applied to the offense level calculation and a Criminal History Category IV, Defendant's sentencing guideline range becomes 18-24 months. In light of Defendant's 23-year record of reoffending, which has repeatedly endangered the public, as well as his loved ones, the government recommends a sentence of 18 months which falls at the very bottom of the new sentencing guideline range.

## I. RECKLESS ENDANGERMENT DURING FLIGHT ENHANCEMENT

The Presentence Report declines to apply the Reckless Endangerment During Flight enhancement, pursuant to U.S.S.G. § 3C1.2. The Court must apply the +2 enhancement if the "defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. "[T]he government must show that the defendant (1) recklessly, (2) created a substantial risk of death or

serious bodily injury, (3) to another person, (4) in the course of fleeing from a law enforcement officer, (5) and that this conduct "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." *United States v. Dial*, 524 F.3d 783, 786–87 (6th Cir. 2008) (quoting *United States v. Southerland,* 405 F.3d 263 (5th Cir. 2005)). That was precisely the case here.

Defendant fled to Indiana after being contacted by the case agent in mid-January 2026 and advised of the federal indictment in this case. On the day of his capture on February 10, 2026, Defendant, who was spotted by Indiana State Police, fled in a vehicle and then on foot. His flight caused investigators to have to pursue him on foot through a snowy field, over fences and up and down snow-covered slippery embankments on either side of an interstate highway, and across interstate highway I-80, which is a four-lane highway with a median while vehicles and semi-trucks passed on the highway in afternoon hours.[1] The investigators who pursued him included Indiana State Police Trooper Kanning and his K-9, Sergeant Waldron, and Trooper Lemmon, and FBI Special Agent Erika Fabbro and Supervisory Special Agent, Rich Capak, trailing behind. Body worn camera footage by Indiana State Police captures the Troopers and Sergeant managing to cross one side of the highway, for example, making it to the median, and having to wait in the median until several cars and semis passed before being able to cross to the other side of the highway.[2] The speed limit on I-80 in that stretch of highway is 70 miles per hour for vehicles and 65 for commercial trucks over 26,000 pounds. After making it across the highway, they had to continue through a snowy wooded area with a deep creek/river, while

[1] *See* Exhibit 1, "Axon_Body_3_Video_2026-02-10_1738_X60A0599U." Defendant is not visible in the footage as he had a head start but law enforcement was able to track him at that point using the K-9 and fresh tracks in several inches of snow.
[2] *Id.*, at approximately 11:56-15:43 minutes.

drones had to be deployed to assist in locating Defendant.[3] With the exception of the highway, all of the areas that pursuing officers had to traverse were covered in several inches of snow, causing the Troopers to slip at various points.[4]

Defendant's flight went on for over 30 minutes in frigid winter temperatures. It culminated in him going through a creek described as a river by the drone operator, and crossing the border into Michigan, prompting Michigan State Police to be contacted.[5] He was finally apprehended in a snow-covered field.[6] After being arraigned in the Western District of Michigan, he was ordered transferred to the Northern District of Ohio pursuant to Federal Criminal Rule 5. (Doc. 5 and 5-1 through 5-6: Transfer Documents, PageID 14-21).

No actual harm to any person is required to show reckless endangerment. *United States v. Hazelwood*, 398 F.3d 792, 796 (6th Cir. 2005) (citing *United States v. Wright,* No. 00–5623, 19 Fed. Appx. 230 (6th Cir. Aug. 28, 2001) (per curiam order)); *see also, United States v. Mukes*, 980 F.3d 526, 536 (6th Cir. 2020) (government need only prove the enhancement by a preponderance of the evidence.). The reckless endangerment enhancement applies where a defendant leads police on a high speed chase where others are likely to be nearby. *Hazelwood*, 398 F.3d at 796 (citing *United States v. Mills,* 1 F.3d 414, 420-23 (6th Cir. 1993)). The enhancement also applies to foot pursuits across oncoming traffic, since the danger to the motoring public posed by a defendant's foot flight is of the same type created by their high-speed chase. *United States v. Reyes-Oseguera*, 106 F.3d 1481, 1481 (9th Cir. 1997) (flight on foot across three lanes of traffic on busy thoroughfare); *United States v. Carter*, 146 F.3d 867 (5th Cir. 1998) (flight on foot across four lanes of a major interstate and back again); *United States v.*

[3] *Id.*, at approximately 33:38-38:11 minutes.
[4] *Id.*, at approximately 16:30-16:45 minutes.
[5] *See* Exhibit 2, "Axon Body_3_X60A0528S," at 18:00-20:00 minutes.
[6] *Id.*, approximately 30:25-30:50.

*Atwood*, 761 F.App'x 651, 653-54 (7th Cir. 2019) (flight on foot across eight lanes of expressway); accord *United States v. Stevenson*, 471 F. Supp. 3d 1178 (D.N.M. 2020). As the *Stevenson* court noted, "In the instant case, like in *Atwood*, Defendant's flight across traffic constitutes reckless endangerment "both because a pursuing trooper could be hit by a car and because other drivers would be at risk of a wreck." *Id.* at 654.

That was precisely the case here. Defendant crossed four lanes of a major interstate highway in the afternoon when vehicles and semis were traveling on it at speeds of *at least* 65-70 miles per hour. The body camera footage of the Indiana State Police troopers showed the many passing vehicles and semis on the highway at the time of day Defendant crossed.[7] It required them to wait at the side of the interstate highway until vehicles and semis passed, cross onto the median, and wait further for additional vehicles and semis to pass before they could make it across the remaining lanes of the highway. In a three-year study of 394 police accident reports detailing fatal interstate pedestrian crashes in Texas, Missouri, and North Carolina that was published in 2026 in the National Academies of Sciences, 40% of the crashes involved pedestrians entering or crossing the highway, and pedestrian fatalities on Interstate highways accounted for more than 10% of all pedestrian fatalities in the United States.[8] By crossing a highway at a time when many vehicles and semis were traveling at high rates of speed, Defendant's flight recklessly endangered the occupants of those passing vehicles and semis, as well as law enforcement in pursuit who also encountered passing vehicles and semis when they needed to cross the same busy highway.

---

[7] Defendant had a head start on the Troopers, thus preventing them from capturing on their body worn cameras the moment Defendant crossed I-80.

[8] https://trid.trb.org/View/578174, last visited October 16, 2026.

Finally, it should be noted that the government is not required to prove that the underlying offense actually *caused* either the reckless endangerment during flight or the flight itself. *Southerland,* 405 F.3d at 268 (there need be only a nexus between the offense and flight, in which the court looks to the state of mind of the defendant during flight). In this case, there is a clear nexus between Defendant's indicted charge and his flight. After the January 7, 2026 indictment, Special Agent Fabbro contacted Defendant on January 15, 2026 via cell phone, informed him of the indictment and arrest warrant, and permitted him to self-surrender. Defendant scheduled it for January 20, 2026, but subsequently requested a one-day delay to January 21st to attend his grandmother's funeral.[9] Defendant failed to appear. Calls to his cell phone that day and the days that followed went straight to voicemail; and subsequent PING search warrants on his phone showed that he was keeping his cell phone off for most of the day, thus thwarting law enforcement efforts to locate him. The FBI checked his known addresses and contacted his girlfriend and family, who also believed Defendant was turning himself in. Because Defendant went on the run after being advised specifically about the indictment in this case, there is a nexus between his federal charge and his reckless flight.

For all of those reasons, the +2 enhancement for recklessly endangering others during his flight has been proven by a preponderance of the evidence and should apply, making Defendant an offense level 11 after acceptance. Because Defendant is a Criminal History Category IV, an offense level 11 results in a new sentencing guideline range of 18-24 months.

## II. GIVEN THE 3553(A) SENTENCING FACTORS AND DEFENDANT'S LENGTHY CRIMINAL RECORD, TWO PRIOR PRISON STINTS, MULTIPLE DISCPLINARY VIOLATIONS DURING BOTH PRISON

[9] In his conversation with the case agent, he expressed concern that if he were to self-surrender on his federal arrest warrant, he would also face extradition to Indiana for an outstanding warrant the agent was unaware of. It was later confirmed he had an active warrant out of Stuben County, Indiana, for Failure to Appear regarding a charge for a felony warrant for resisting officers. He had also previously fled from officers in Lucas County on August 10, 2023, resulting in a separate conviction for Fleeing and Eluding.

**TERMS, AND REPEATED PROBATION VIOLATIONS AND FAILURES TO APPEAR WHEN GIVEN OPPORTUNITES ON PROBATION IN PAST CASES, A GUIDELINE RANGE SENTENCE OF 18 MONTHS IS NECESSITATED, WHICH IS AT THE LOW END OF HIS SENTENCING GUIDELINE RANGE.**

**A. Defendant's Prior Record**

In order to "secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark," after which the court must consider "all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). While a sentencing court has the power to vary from the Guidelines, *see Kimbrough v. United States,* 552 U.S. 85, 109 (2007), the Supreme Court has emphasized that if a sentencing court imposes a non-Guidelines sentence, then "closer review *may be* in order." *Id.* (emphasis added); *Spears v. United States*, 555 U.S. 261, 264 (2009) (per curiam). "[T]he Guidelines are not only the starting point . . . but also the lodestar." *Martinez v. United States*, 578 U.S. 189, 200 (2016). The guideline range in this case, with the addition of the +2 Reckless Endangerment During Flight enhancement, is 18-24 months. (Doc. 12: Final PSR, ⁋ 70). The government seeks a guideline range sentence of 18 months, which falls at the very bottom of the guideline range.

The Sentencing Guidelines explicitly state that, "The Comprehensive Crime Control Act sets forth four purposes of sentencing[,] *see* 18 U.S.C. § 3553(a)(2)," and "a defendant's record of past criminal conduct is directly relevant to those purposes." U.S.S.G. § 4A1.1. Those purposes of sentencing in § 3553(a)(2) include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide a just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public. 18 U.S.C. § 3553(a)(2).

Section § 4A1.1 of the Sentencing Guidelines Manual states: "A defendant with a record of criminal behavior is more culpable than a first offender and thus deserving of greater punishment." U.S.S.G. § 4A1.1. It also states that, "[r]epeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation." *Id.* Defendant has committed criminal offenses for the past twenty years and he is a Criminal History Category IV, thus proving he has not been deterred in the least over the past two decades.

Defendant has 26 prior criminal convictions, which include crimes of violence against loved ones, possessing a firearm as a convicted felon, assembling, possessing and manufacturing methamphetamines, receiving stolen property, stealing, driving under the influence, countless regulatory driving offenses that keep motorists safe, and *several* offenses that demonstrate his refusal to comply with law enforcement even if it endangers others—i.e., resisting arrest, obstructing official business, and fleeing from law enforcement on multiple occasions even before his reckless flight on February 10, 2026. (Doc. 12: Final PSR, ⁋ 24-45). Defendant began amassing criminal convictions at the age of 18 and he has continued to reoffend for 23 years. (*Id.*). From the age of 37-40 alone, this now 42-year-old Defendant amassed four felony convictions, three at the state level and the federal felony in this case, as well as fled from law enforcement two different times in that timeframe (in 2023 and 2026). (*Id.*, ⁋⁋ 42-45).

While the defense will likely note that many of his priors are misdemeanors, his conduct in many of those cases is, nonetheless, concerning. For example, in one misdemeanor Domestic Violence conviction, he grabbed his mother by her neck, choked her, threw her to the ground, and spit on her. (*Id.*, ⁋ 27). In one of his Disorderly Conduct convictions, which was amended from Domestic Violence, he grabbed the mother of one of his children by her face, pushed her, and threw a bullet at her. (*Id.*, ⁋ 32). In yet another Disorderly Conduct conviction, he violated a

Protection Order put in place by one of the mothers of his children by contacting her and entering her home. (*Id.*, ⁋ 38). Several of Defendant's other 'low level' convictions endangered motorists on the roadways and/or law enforcement—e.g., *multiple* occasions Defendant drove under the influence (*id.*, ⁋ 41); in one of his many prior convictions for driving without a license, he actually failed to control his vehicle (*id.*, ⁋ 44); and in yet another Disorderly Conduct conviction, he fled on foot from a traffic stop (*id.*, ⁋ 36). Similarly, in his Obstructing Official Business conviction in 2023, he fled yet again from officers as they attempted to arrest him for outstanding warrants. (*Id.*, ⁋ 45). In fact, he fled from police and/or resisted arrest in 2004, 2013, August 2023, September 2023, and here in 2026—over a 20-year period. In 2023, his failure to comply with the signal of police resulted in a high speed chase through multiple city streets and Defendant crashing his vehicle before fleeing on foot. (*Id.*, ⁋ 43). In fact, in his 23 years of reoffending, he has committed offenses that have hurt loved ones and endangered not only pursuing officers but any citizen who happens to find himself/herself in Defendant's path, whether on a roadway, while he was manufacturing meth, or when he was possessing guns as a convicted felon. (*Id.*, ⁋⁋ 25, 36, 43, 45, and 9).

While the defense will likely advocate for a sentence of probation, it is important to note that his new guideline range of 18-24 months falls within Zone D of the Guidelines, making Defendant ineligible for probation. To the extent the defense advocates for a time-served sentence with supervised release, it is also important to note that when given prior opportunities on probation, Defendant violated the conditions of his probation and failed to appear in court on multiple occasions as ordered, resulting in bench warrants. (*Id.*, ⁋ 30, 33). The conditions of supervision in federal court will be similar to those in state court, casting doubt on any future compliance.

In fact, Defendant has a history of noncompliance with not just the law and conditions of his probation but also rules in the institution. During a prior prison term that began in 2013 when he was 29 for felony Illegal Assembly/Chemical Manufacture of Drugs, Defendant committed disciplinary infractions for being out of place on three different occasions and for disobeying a direct order. (*Id.*, ⁋ 31). During his second prison term that began when he was 39 years old, in which he was sent to prison in two different criminal cases, his disciplinary record in the institution was *worse* than his first prison stint. That is, he was even less compliant when he *should* have been wiser with another decade-plus in age and thus more compliant. (*Id.*, ⁋ 42). In that prison term, he possessed contraband, stole or embezzled property, was caught out of place on two occasions, gave false information on two occasions, and violated a published institutional rule. (*Id.*).

Although Defendant will undoubtedly claim he is committed to bettering himself going forward, his conduct in prior cases speaks louder than words and disproves his claim. In addition to his 23-year pattern of reoffending, he did no programming in the institution to better himself during two different prison terms. While serving 24 months in prison in his late 20's, Defendant did not complete *any* programming. He did the exact same thing again in his late 30's. While serving 12 months in prison, which he began serving at the age of 39, Defendant yet again did not complete a *single* program in the institution. (*Id.*, ⁋ 31, 42). In other words, not only has he committed more disciplinary violations in prison as he has gotten older when one expects the opposite effect, this 42-year-old Defendant made no effort to try to better himself in his late 20's and late 30's when afforded programming to do so.

**B. Defendant's Offense Conduct**

The nature and circumstances of Defendant's actions in this case are serious. He risked temporarily distracting, possibly temporarily blinding the pilots in this case, who were flying their law enforcement aircraft. He did not just strike the aircraft once with the laser; he struck the aircraft multiple times according to the pilots. (Doc. 12: Final PSR, ⁋ 8). In fact, the pilots reported that it appeared they were being intentionally tracked by the Defendant and his laser pointer. (*Id.*). It goes without saying that any time a pilot can be blinded, even temporarily, it poses a danger to the community. This is not an imaginary threat but a very real one, particularly given that the pilots were flying over a residential neighborhood at the time.

Laser pointers are statutorily defined as "any device designed or used to amplify electromagnetic radiation by stimulated emission that emits a beam designed to be used by the operator as a pointer or highlighter to indicate, mark, or identify a specific position, place, item, or object." 18 U.S.C.A. § 39A(b) (West 2012). Pilots who have suffered lasering attacks have reported a wide range of serious symptoms, prompting Air Traffic Control (ATC) to regard lasering incidents as in-flight emergencies.[10] It can result in flash blindness, after-imaging, and continued retinal burning,[11] as well as abnormal ocular discomfort or pain.[12] The most unsettling symptom, however, reported by pilots who have been lasered is the distraction it causes in real time – rendering them unable to give their full attention to flying the aircraft.[13] Even subtle

---

[10] *See* FED. AVIATION ADMIN., ADVISORY CIRCULAR No. 70-2A, REPORTING OF LASER ILLUMINATION OF AIRCRAFT 1 (2013), at 1 [hereinafter FAA, LASER ILLUMINATION]

[11] Press Release, Air Line Pilots Ass'n Int'l, Stopping Laser Attacks on Aircraft: No Shot in the Dark (Nov. 1, 2015), http://www.alpa.org/news-and-events/news-room/112015-stopping-laser-attacks, at 2 [hereinafter Stopping Laser Attacks] [https://perma.cc/Z6BF-LBVC].

[12] FED. AVIATION ADMIN., No. 17-2021, LASER HAZARDS IN NAVIGABLE AIRSPACE, FAA, https://www.faa.gov/pilots/safety/pilotsafetybrochures/media/laser_hazards.pdf, at 5 [hereinafter FAA, NAVIGABLE AIRSPACE] [http://perma.cc/WLS3-K4L8].

[13] Patrick Murphy & Captain Daniel Hewett, *FDA's Proposed Change to the Regulation of Laser Pointers*, INT'L LASER DISPLAY ASS'N, fig. 2, http://www.la-serpointersafety.com/resources/FDA-CDRH-TEPRSSC/2017-ILSCFDA-Proposed-Change-Laser-Pointers-v07.pdf [http://perma.cc/HA4V-5FTQ.

distractions, or minor loss of vision while a pilot is operating an aircraft, especially during takeoff and landing, could be catastrophic.[14] While the government is unaware of any crashes to date that have been definitively linked to laser strikes, the potential for an accident remains when pilots are hindered from performing their duties.[15] Indeed, laser strikes have forced pilots to abort landings in the past, which creates aviation delays that are burdensome in an industry that runs on precise timing.[16]

Furthermore, when someone strikes an aircraft with a laser or laser pointer, the pilots have been trained to alert Air Traffic Control (ATC) and for ATC to then broadcast warnings to other pilots in the area.[17] This takes up valuable communications bandwidth, burdening the system, and potentially leading to miscommunications or airplane mishaps.[18] Because Defendant struck the aircraft in this case multiple times, the pilots were forced to remain in the area, radio ATC, and request crews to respond to Defendant's residence.

There has been a sharp increase in reported lasering incidents over the last few years.[19] More specifically, reports of lasers illuminating airplane cockpits have increased at an alarming rate.[20] Although Congress and the Federal Aviation Administration (FAA) have passed laws and regulations that criminalize such conduct,[21] these prohibitions have not managed to decrease the

---

[14] *See* FAA, LASER ILLUMINATION, *supra* note 9.

[15] *See* FAA,NAVIGABLE AIRSPACE, *supra* note 11.

[16] *Id*.

[17] FAA, LASER ILLUMINATION, *supra* note 6, at 2-3.

[18] *Id*. at 3.

[19] Murphy & Hewett, *supra* note 12.

[20] *Id.*

[21] FAA Modernization and Reform Act of 2012, H.R. 658, 112th Cong., SEC. 311, § 39A (2012).

activity.[22] According to the United States Government Accountability Office (GAO), 86 laser cases were referred to the U.S. Attorney's Offices between July 2016 and September 2022, resulting in 44 subjects being prosecuted and 40 convictions.[23] In the Western District of Missouri, a defendant was sentenced to 36 months in prison for striking an aircraft with a laser pointer. *United States v. Rogers*, 881 F.3d 1054, 1055 (8th Cir. 2018), *distinguished on other grounds by, United States v. Baca*, 350 F.Supp.3d 1164 (D.N.M. Oct. 30, 2018). In the Eastern District of California, a defendant was sentenced to the maximum 60 months in prison, despite a guideline range of 21-27 months, because he repeatedly aimed a laser pointer at a helicopter, he was a CHC VI and on probation at the time, and he allowed his minor children to be involved. *United States v. Rodriquez*, 664 Fed. Appx. 607, 609 (9th Cir. 2016) (rejecting defendant's argument of a sentencing disparity with his co-defendant who co-habited with him). In the Western District of Wisconsin, a defendant was sentenced to 24 months in prison for aiming a laser at a commercial flight, and subsequently at the law enforcement helicopter trying to locate him.[24]

In support of its 60-month sentence, the Ninth Circuit in *Rodriguez* relied on many of the same facts that are present in this case. Namely, it cited the fact that Rodriguez struck the aircraft *multiple* times, just as the pilots in this case reported Defendant did (Doc. 12: Final PSR, ⁋ 8), and that "aiming the laser pointer at the helicopter *just once* would have been sufficient for

---

[22] Murphy & Hewett, *supra* note 1.

[23] *FAA Should Strengthen Efforts to Address the Illegal Practice of Intentionally Aiming Lasers at Aircraft*, U.S. GOV'T ACCOUNTABILITY OFFICE (Aug. 2022), https://www.gao.gov/assets/d22104664.pdf, and pp. 14-15 of associated 51-page GAO Report. Identifying and catching the perpetrator can be difficult in laserings, thus resulting more lasering incidents than the number of lasering prosecutions.

[24] *Minnesota Man Sentenced to 2 Years for Aiming Laser at Aircraft*, U.S. ATT'YS OFFICE, W.D. WIS. (Apr. 6, 2023), https://www.justice.gov/usao-wdwi/pr/minnesota-man-sentenced-2-years-aiming-laser-aircraft.

a § 39A offense." *Rodriguez*, 664 Fed.Appx. at 609. Further, the Ninth Circuit cited Rodriguez's lengthy criminal record and CHC VI, calling his record "aggravating beyond what his criminal history score indicated," in support of the 60-month prison term. *Id.* Similarly, Defendant Lounsbury's criminal history is lengthy, aggravating, and a CHC IV. In fact, the *Rodriguez* court specifically relied on the fact that Rodriguez's prior history, which virtually mirrors Defendant's prior criminal conduct, consisted of prior felony convictions, obstructing and resisting officers, prior felony commitment, six misdemeanors when Defendant here has been convicted of ***20*** *misdemeanors*, and past conduct that injured loved ones and endangered officers—*all of which Defendant has been previously convicted of too*. The 18-month prison term the government recommends takes into account that Defendant did not involve children in his lasering and was not on probation at the time like Rodriguez was. The government's 18-month sentencing recommendation—notably at the very bottom of the new sentencing guideline range—is demonstrably lower than the *Rodriguez* sentence upheld by the Ninth Circuit, thus proving it is not greater than sufficient to satisfy the principles of sentencing.

Although the defense will likely argue that a time-served sentence can accomplish the goals of sentencing, courts have previously recognized that, "Even if a lesser sentence may have been reasonable," "so may a greater sentence." *United States v. Ngheim*, 432 Fed. Appx. 753. 757 (10h Cir. 2011) ("There will almost always be a range of reasonable sentences."). "The fact that [we] might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586 (2007).

## III. <u>CONCLUSION</u>

For all of these reasons, the +2 Reckless Endangerment During Flight enhancement applies, which results in a sentencing guideline of 18-24 months. The government seeks a prison term of 18 months.

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney
Northern District of Ohio

By: <u>/s/ *Tracey Ballard Tangeman*</u> (0069495)
Tracey Ballard Tangeman
Assistant U.S. Attorney
433 N. Summit St., Suite 308
Toledo, Ohio 43604
Tel. No. (419) 259-6376
Fax No. (419) 259-6370
Tracey.Tangeman@usdoj.gov